UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DENNIS HINDS,                                    :

                            Petitioner,          :        **REPORT AND
                                                          RECOMMENDATION
       -against-                                 :        TO THE HONORABLE
                                                          JED S. RAKOFF**
BRIAN S. FISCHER,                                :

                                                          03 Civ. 0907 (JSR)(FM)
                            Respondent.          :

--------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

I.    Introduction

            Petitioner Dennis Hinds ("Hinds") brings this habeas corpus proceeding,

pursuant to 28 U.S.C. § 2254, to challenge his conviction on one count each of Robbery

in the First and Second Degrees following a jury trial in Supreme Court, New York

County, before Justice Dorothy A. Cropper.  (See Pet. ¶¶ 1, 4, 6; Decl. of Ass't Att'y

Gen. Willa J. Bernstein, dated Sep. 18, 2003 ("Bernstein Decl."), ¶ 1).  On December 1,

1997, Justice Cropper sentenced Hinds, as a second felony offender, to concurrent

fifteen-year sentences.  (S. 12).[1]

            Hinds' pro se petition is dated January 15, 2003, and was timely received

by the Pro Se Office of this Court on January 22, 2003.  (See Pet. at 2, 7).  In his petition,

---

[1]      "S." refers to the minutes of Hinds' sentencing on December 1, 1997.  (Docket
No. 9).  "Tr." refers to the state court record of the pretrial and trial proceedings.  (Docket
Nos. 8, 9).

Hinds raises two issues.  First, Hinds contends that the trial court erred by failing to grant

him an independent source hearing with respect to a lineup identification of him by an

uninvolved bystander which he alleges was unduly suggestive, even though his co-

defendant Freddie Hill ("Hill") was granted such a hearing.[2]  (See id. at 5a).  Second,

Hinds maintains that his trial counsel was ineffective.  (Id.).

       For the reasons that follow, Hinds' petition should be denied.  Additionally,

because Hinds has not made a substantial showing of the denial of a constitutional right,

as required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

II.    Background

    A.    Wade/Dunaway Hearing

       Before trial, Justice Cropper conducted a combined Wade/Dunaway

hearing[3] on November 3 and 5, 1997, during which the People called Police Officers Paul

Lawson ("Lawson") and Norman Calderon ("Calderon"), and Detective Luis Soto

("Soto") as witnesses.  (See Tr. 1-137).  Their uncontradicted testimony, which Justice

Cropper credited, established that on May 12, 1997, Jovani Santana ("Santana") reported

to Lawson that he had been robbed by two black males, one of whom had brandished a

gun.  (Id. at 5).

_____

    [2]    Hill was acquitted at trial.  (Tr. 869).

    [3]    See Dunaway v. New York, 442 U.S. 200 (1979); United States v. Wade, 388
U.S. 218 (1967).  At a Dunaway hearing, the court determines whether there was probable cause
for the defendant's arrest.  Nieves v. Fischer, No. 03 Civ. 9803 (DC), 2004 WL 2997860, at *1
n.2 (S.D.N.Y. Dec. 28, 2004).  At a Wade hearing, the court considers whether a pretrial
identification of a defendant "has an independent basis of reliability and is therefore admissible
during the trial."  Georgison v. Donelli, No. 04 Civ. 1444 (DC), 2005 WL 1384015, at *1 n.2
(S.D.N.Y. June 9, 2005).

Thereafter, on May 29, 1997, Santana told Lawson that one of the men who robbed him had initiated a conversation with him on more than one occasion. (<u>Id.</u> at 26, 59-60). According to Santana, during one of the conversations, Hinds told him that Hill's brother would "come look for him" if he testified against Hill in the grand jury. (<u>Id.</u> at 60-61). After learning this, Lawson and Calderon canvassed the neighborhood with Santana in a livery cab with tinted windows. (<u>Id.</u> at 27). While they were parked on Saint Nicholas Place between 151st and 152nd Streets, Santana indicated that one of the men who had robbed him, later determined to be Hinds, was standing in front of a building. (<u>Id.</u> at 27-28). Hinds was wearing a long-sleeved white and blue striped shirt and blue jeans. (<u>Id.</u> at 28). The officers were unable to apprehend Hinds, however, because he entered a locked building as they were approaching. (<u>Id.</u> at 28-29). Later that day, Lawson returned to the location, where he was able to arrest Hinds. (<u>Id.</u> at 29).

That same evening, both Santana and Monique Wareham ("Wareham"), the witness to the robbery, viewed a lineup consisting of five seated individuals: Hinds and four "fillers." (<u>Id.</u> at 29-32). Calderon drove Santana to the 30th Precinct where the lineup took place. (<u>Id.</u> at 30, 103). Once he was at the precinct, Santana was taken to a room in the detectives unit, where Wareham also eventually was brought. (<u>Id.</u> at 30-32). Lawson instructed them both not to speak to each other, and Calderon remained in the room to ensure that they complied. (<u>Id.</u> at 32, 104-05). Hinds was behind a closed door in another room, which ensured that neither Santana nor Wareham had an opportunity to view him or the fillers prior to the lineup. (<u>Id.</u> at 30-32, 105-06). The fillers all were

dark-skinned black males, with mustaches and short hair, who wore white tank tops or t-shirts.  (<u>Id.</u> at 32-33).

When Santana entered the viewing room, Soto explained to him in Spanish that he was going to view a lineup of five males and would be asked if he recognized any of them.  (<u>Id.</u> at 116-17).  After looking at the lineup for about "a second and a half," Santana identified Hinds as one of the individuals who had robbed him.  (<u>Id.</u> at 95, 117-18).  Santana then was returned to the room where Wareham was waiting, but he did not have any opportunity to speak to her before she viewed the lineup.  (<u>Id.</u> at 94, 97).

When Wareham was brought to the viewing room, Soto explained to her that she would be viewing a lineup and should tell him if she recognized anyone.  (<u>Id.</u> at 119-20).  Wareham looked at the lineup for about "a second" and then identified Hinds as one of the individuals who had robbed Santana.  (<u>Id.</u> at 95, 120).

At the conclusion of the hearing, Hinds' trial attorney, Claudia Conway, Esq. ("Conway"), of the Legal Aid Society, moved to suppress both lineup identifications.  (<u>Id.</u> at 130).  Conway contended that the lineup was impermissibly suggestive because Hinds was the only person in the lineup who had hair long enough to be characterized as an Afro.  (<u>Id.</u> at130, 134).  Building on this theme, Conway argued that Santana should not be permitted to testify about the lineup at trial or make an in-court identification, unless the prosecution established that his identification was not tainted by the lineup.  (<u>Id.</u> at 134-35).  Conway maintained that such taint existed because Santana did not have the opportunity to view Hinds for very long when he pointed him out on the

street earlier on May 29th.  (Id. at 135).  The prosecutor countered that "the photos speak for themselves," and that everyone in the lineup was wearing similar clothes, and had similar builds and hair.  (Id. at 135-36).

Immediately after the hearing, Justice Cropper denied Hinds' motion to suppress, noting that "the photograph [of the lineup] shows . . . that [everyone] had similarly close cropped hairdos," with the difference limited to whether their hair was "parted on the side or parted [i]n the middle."  (Id. at 132-33, 137).  On November 10, 1997, Justice Cropper supplemented that oral ruling with a written decision in which she made the following findings:

> The lineup was comprised of individuals who were substantially similar in appearance to [Hinds].
>
> . . .
>
> The point out of . . . Hinds was not predicated upon any suggestion or illegal activity by the police.
>
> . . .
>
> The lineup procedure was essentially confirmatory in nature in view of . . . Santana's point out of . . . Hinds on the street.  In any event, the lineup was fair and free from police suggestion.  The fact that [Hinds'] hair was somewhat different from the hair of the other participants does not affect the validity of this lineup since the difference in the length of [Hinds'] hair and the hairdo itself were not so distinctive as to render the lineup suggestive or to result in the likelihood of misidentification.

(Bernstein Decl. Ex. A at 4-5) (internal citations omitted).

Justice Cropper similarly denied Hill's suppression motion directed to Santana's pretrial identification of him. (See id.). During the <u>Wade</u> hearing, however, there was testimony that before Santana viewed a photo array containing Hill's photograph, he had been left in a room at the precinct where Hill's picture was on a "wanted wall." (<u>Id.</u> at 6-7). For that reason, the Justice ordered that Santana testify at an independent source hearing. (Tr. 128, 136-37). At that hearing, Santana testified that he had an opportunity to observe the gunman for "seven or 10 minutes" during the incident. (<u>Id.</u> at 413). Justice Cropper evidently found this sufficient to remove any potential taint resulting from the photograph on the precinct wall since she permitted him to testify at trial about his lineup identification of Hill. (See <u>id.</u> at 476-77, 480-82, 490-91).

B.    <u>Motion to Sever</u>

Shortly before counsel's opening statements, Conway made an oral motion to sever the two defendants' trials because Hinds would be presenting a defense "antagonistic" to Hill's defense. (<u>Id.</u> at 427-31). Conway also stated that she had overheard Hill threatening Hinds and instructing him not to follow the trial strategy to which Hinds and she had agreed. (<u>Id.</u> at 430). Conway argued that the severance was necessary because Hinds would testify that he was present at the scene of the crime, but that he did not know that Hill had a gun, or that a robbery was going to take place. (<u>Id.</u> at 428). At the conclusion of Conway's argument, which was made outside of Hill's presence, Hinds told the court that he opposed his counsel's motion and wished to proceed with a joint trial. (<u>Id.</u> at 431-32). Justice Cropper then denied the motion for

severance, and Hinds' <u>pro se</u> request for the appointment of new counsel to represent him. (<u>Id.</u> at 432).

      C.    <u>Trial</u>

            1.    <u>People's Case</u>

At trial, the People called as witnesses Santana, Wareham, Lawson, Soto, and Calderon. Their testimony, and the other evidence would have permitted a reasonable juror to find as follows:

On May 12, 1997, at approximately 8:25 p.m., Santana was returning home from work when Hinds and another man surprised him in the stairway of his building as he was on his way to his third floor apartment.[4] (<u>Id.</u> at 443-46, 454). Hinds stood behind Santana holding a white telephone cord while the other man pointed an automatic pistol at Santana's nose in the area of his left eye. (<u>Id.</u> at 448, 452-53). Neither was wearing a mask over his face. (<u>Id.</u> at 454).

The other man hit Santana in the face with his pistol, causing him to fall down a few steps, and then instructed him to open his apartment. (<u>Id.</u> at 455). Santana, however, failed to comply. (<u>Id.</u> at 455-56). After the men took Santana's keys, Wareham, who lived on the second floor of the building and had been walking her dog, came up the stairs and noticed Hinds pacing in the second floor hallway. (<u>Id.</u> at 456-57, 560, 562). Wareham also saw Santana lying on the steps with his hands by his face as

---

[4]    Because Hill was acquitted, this factual recitation refers to the person identified by Santana as Hinds' accomplice using such terms as the "other man."

another man with a gun was about to strike him.  (Id. at 563).  After making these

observations, Wareham turned to walk back down the stairs, but Hinds grabbed her by her

lapels and threatened to hurt her if she called the police.  (Id. at 457, 562, 566-67).  The

other man then took $300 from Santana, and Hinds took Santana's watch and ring.  (Id. at

458-60).  After forcibly taking this property, the two told Santana to sit on one of the

steps, and the gunman hit him on the back of the head with the gun.  (Id. at 460).  The

entire incident lasted about seven to ten minutes, during which time Santana was able to

see both robbers' faces.  (Id. at 461).

After Hinds released Wareham, she ran out of the building and remained

outside for five minutes before returning.  (Id. at 574-75).  When she was back inside the

lobby, she saw Hinds starting to walk out, but he stopped and spoke to her face-to-face,

saying "much respect, much respect."  (Id. at 574-75, 596).  He and the other man then

left the building and headed uptown.  (Id. at 575-76, 596).  Wareham returned to her

apartment, but she did not call the police because she was scared.  (Id. at 577).

After the robbers left, Santana ran to his apartment and knocked on the door

since the robbers had taken the keys to his apartment.  (Id. at 472).  Once inside, he called

the police, who arrived within ten to twelve minutes, at which time Santana gave them a

description of the robbers.  (Id. at 472-74).  The police drove around the area with

Santana, but were unable to locate either of the robbers at that time.  (Id. at 474).

Santana subsequently saw Hinds almost every day.  (Id. at 495).  On May

29, 1997, Hinds told Santana that his money, watch, and ring would be returned if he did

not testify in court (i.e., before the grand jury) the following day.  (Id. at 496-97).  By the time of that conversation, Hinds had cut his hair and no longer had an Afro.  (Id. at 497, 549).  After the conversation, which lasted about one minute, Santana returned to his apartment and called Lawson, who then canvassed the area with him in a livery cab with tinted windows.  (Id. at 498-500, 627-28).  Santana saw Hinds entering into an apartment building, but the police were unable to arrest him at that time.  (Id. at 498-500).  Lawson then took Santana back to a hotel where he had been staying with his family to ensure their safety.  (Id. at 500-01).  Hinds subsequently was arrested at around 10 p.m. that night.  (Id. at 629-30).

> 2.    Defense Case

Hill did not present a case, but Hinds testified in his own defense.  (Id. at 719).  Before he did so, Conway advised the court outside the presence of the jury that he was testifying against her advice.  (Id. at 716).

Hinds' testimony painted a different picture than the one that Conway had presented as the basis for her severance motion.  Thus, Hinds admitted that he was present in Santana's building on the day of the robbery, but claimed that the incident witnessed by Wareham was merely an argument resulting from a drug deal gone bad.  (Id. at 725-28).  Hinds testified that he previously had purchased some cocaine from Santana. (Id. at 722-23).  Because he was dissatisfied with its quality, Hinds returned the cocaine to Santana, who agreed to replace it or refund the $4,000 that Hinds had paid him.  (Id. at 723-24, 727-28, 753-54).

When Santana failed to contact him following that conversation, Hinds returned to the building on May 12, 1997, to look for him.  (Id. at 724-25).  An argument ensued when Hinds found Santana on the stairs.  (Id. at 726-28).  According to Hinds, while the two were arguing, he swung his arms in anger and accidentally hit Wareham as she was coming up the stairs with her dog.  (Id. at 728).  Wareham's dog then escaped and she followed it back down stairs.  (Id.).  As Hinds was leaving the building, he saw Wareham looking for her dog, and he apologized to her for hitting her.  (Id. at 729).  Wareham then asked him if he was okay, and he stated that he was.  (Id.).  After purchasing and consuming a Guinness across the street, Hinds eventually left the area.  (Id. at 729-30).  He testified that he had no further conversations with Santana even though his money had not been returned.  (Id. at 730-31).

3.      Conviction and Sentencing

On November 13, 1997, the jury returned a verdict of guilty against Hinds on one count each of Robbery in the First and Second Degrees.[5]  (Tr. 856, 859-60). Justice Cropper then set December 1, 1997 as the sentencing date.  (Id. at 863).

At the sentencing, Conway asked for an adjournment so that the "Defenders Service" could prepare a presentence memorandum.  (S. 2).  Justice Cropper denied this

---

[5]      Hinds was acquitted on a third count of Robbery in the Second Degree, which charged that he had caused physical injury to Santana during the incident or the immediate flight therefrom.  (Id. at 843, 860-61).

request, stating that the defense had had sufficient time to make any necessary submissions. (Id. at 2-3). Conway then moved to set aside the verdict based on a pro se motion prepared by Hinds which evidently contested the sufficiency of the evidence. (Id. at 3-4). That application also was denied. (Id.). Thereafter, Justice Cropper sentenced Hinds, as a second felony offender, to two concurrent fifteen-year sentences. (Id. at 8, 12).

      D.    Subsequent Procedural History

          1.    Direct Appeal

Hinds evidently was appointed new counsel in connection with his appeal. (See Bernstein Decl. Ex. B; Pet. ¶¶ 15(c)-(e)). In December 2000, three years after the sentencing, his appellate attorney, Edith Blumberg, Esq., filed an appellate brief,[6] which sought to reverse Hinds' conviction on the grounds that (a) the trial court erroneously failed to grant Hinds an "independent source hearing" with respect to the lineup identifications of him by Wareham and Santana, and (b) Conway's "strange conduct" at the pretrial hearing and trial amounted to ineffective assistance of counsel. (Bernstein Decl. Ex. B at ii). On September 20, 2001, in a unanimous decision, the Appellate Division, First Department, rejected both claims. People v. Hinds, 730 N.Y.S.2d 230 (1st Dep't 2001). In its decision, the court held that the trial court had properly denied Hinds' suppression motion because "the difference between [Hinds'] hairstyle and the hairstyles

---

[6]     The papers submitted by the parties do not explain this lengthy delay.

of the fillers was insignificant and did not call undue attention to [Hinds]." Id.

Accordingly, because the lineup was not suggestive, the court held that an independent

source hearing was unnecessary. Id.

The court further concluded that Hinds' ineffective assistance of counsel

claim was not reviewable on direct appeal because it "primarily involve[d] questions of

trial strategy and matters dehors the record regarding communications between [Hinds]

and counsel," which were "the type of matters that would require expansion of the record

by way of a CPL § 440.10 motion." Id. The court went on to observe, however, that

> [t]o the extent that the existing record permits review, it
> establishes that defendant received meaningful representation.
> We note specifically that there is no reason to believe that the
> additional lines of cross-examination and argument that
> [Hinds] claims his trial counsel should have employed at the
> hearing would have resulted in the suppression of any
> evidence.

Id. Despite the suggestion that Hinds' ineffective assistance claim could only be

exhausted through a collateral motion, Hinds never filed a Section 440.10 motion.

By letter dated October 21, 2001, Hinds' counsel sought leave to appeal to

the New York Court of Appeals, enclosing copies of the appellate briefs. (Bernstein Aff.

Ex. D at 3). That letter did not highlight any issue that Hinds wished to have reviewed.

Subsequently, on December 10, 2001, Judge Victoria A. Graffeo denied Hinds' leave

application. See People v. Hinds, 97 N.Y.2d 683 (2001).

2.   This Proceeding

Hinds' habeas petition is dated January 15, 2003, and was timely received by the Pro Se Office on January 22, 2003.  (See Pet. at 2, 7).  In his petition, Hinds reasserts the two grounds raised by his counsel on his direct appeal.  (Pet. at 5a).  Hinds does not provide any detail concerning either claim.  Nevertheless, because Hinds is proceeding pro se, I have assumed that he seeks to advance every claim raised on his direct appeal.

On September 19, 2003, the Respondent submitted a memorandum of law and other papers in opposition to Hinds' petition.  (See Docket Nos. 6-9).

III.   Discussion

A.   Exhaustion

Even if a petition is timely, it may not be granted unless it appears that the petitioner has exhausted all available state court remedies, or there is an absence of state corrective process, or circumstances render that process ineffective to protect the petitioner's rights.  See 28 U.S.C. §§ 2254(b)(1)(A), (B).  As a defendant charged with crimes in New York State, Hinds unquestionably had an effective process available to him through the existing state statutes governing appeals and collateral challenges in criminal cases.  See N.Y. Crim. Proc. Law §§ 440.10, 450.10 (McKinney 2005).  Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim, Hinds must show that he presented the substance of "the same federal constitutional claim[] that he now urges upon the federal courts to the highest court in the . . . state."

Aparicio v. Artuz, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal citations and quotation marks omitted).

"A federal constitutional claim has not been fairly presented to the [s]tate courts unless the petitioner has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" Strogov v. Att'y Gen. of N.Y., 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982)). To meet this requirement, it is not necessary that the federal constitutional claim be presented to the state courts in haec verba. Indeed, there are a number of ways in which the claim may be presented, including:

> [1] reliance on pertinent federal cases employing constitutional analysis, [2] reliance on state cases employing constitutional analysis in like fact situations, [3] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and [4] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194. A petition is not deemed exhausted if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The Respondent concedes that Hinds' first claim concerning the lineups was presented to the Appellate Division in constitutional terms and is fully exhausted. (Resp't's Mem. at 14). As to the ineffective assistance of counsel claim, however, the Appellate Division expressly held that Hinds had failed to pursue the appropriate

-14-

avenue – namely a motion pursuant to Section 440.10 of the New York Criminal Procedure Law – insofar as he sought to rely on "questions of trial strategy and matters dehors the record regarding communications [with his] counsel." Hinds, 730 N.Y.S.2d at 230.  On the other hand, the Appellate Division ruled on the merits of Hinds' ineffective assistance claim to the extent that it found "no reason to believe that the additional lines of cross-examination and argument that [Hinds] claims his trial counsel should have employed . . . would have resulted in the suppression of any evidence" at the Wade hearing.  Id.

A federal habeas court presented with unexhausted claims may either stay the petition or dismiss it without prejudice, so that the petitioner can return to state court to pursue exhaustion.  See Rhines v. Weber, 544 U.S. 269 (2005); Duncan v. Walker, 533 U.S. 167, 182-83 (2001) (Souter, J., concurring); Zarvela v. Artuz, 254 F.3d 374, 380-81 (2d Cir. 2001) (discussing procedures applicable to "mixed" petitions containing both exhausted and unexhausted claims).  Nevertheless, in Rhines, the Supreme Court recently held that

> stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.  Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

Rhines, 544 U.S. at 277.

In this case, Hinds has proffered no explanation for his failure to exhaust his ineffective assistance claim through a Section 440.10 motion, as the Appellate Division stated was necessary. Nonetheless, it is settled law that a court may <u>deny</u> a petition on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Accordingly, because Hinds' ineffective assistance claim clearly lacks merit, and therefore must be denied, there is no need to consider the issue of exhaustion in any further detail.

B.    <u>Merits</u>

1.    <u>Standard of Review</u>

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993). Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The petitioner bears the burden of proving[,] by a preponderance of the evidence[,] that his rights have been violated." <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones</u>, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" <u>Jones v. Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. <u>Id.</u> at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" <u>Jones</u>, 229 F.3d. at 119 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams v. Taylor, 529 U.S. at 389.

### 2. Suggestive Identification and Failure to Conduct Independent Source Hearing

Hinds' first claim has two branches: first, Hinds contends that the lineup he took part in was unduly suggestive; second, he maintains that, like Hall, he should have been granted an independent source hearing. (Pet. at 5a).

In his brief on appeal, Hinds alleged that the lineup identification of him by Wareham and Santana at the 30th Precinct was improper because he was the only person in the lineup with long hair on the top of his head. (See Bernstein Decl. Ex. B at 40-42). To prevail on this claim, Hinds must first establish that the pretrial identification procedures were so suggestive that they created "a very substantial likelihood of irreparable misidentification." United States v. Mohammed, 27 F.3d 815, 821 (2d Cir. 1994) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). The focus of the inquiry is on the possibility of misidentification, rather than the police conduct, because a

suggestive procedure "does not in itself intrude upon a constitutionally protected interest."  Wray v. Johnson, 202 F.3d 515, 524 (2d Cir. 2000) (quoting Manson v. Brathwaite, 432 U.S. 98, 113 n.13 (1977)).  Thus, "even a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability."  Mohammed, 27 F.3d at 821 (quoting United States v. Simmons, 923 F.2d 934, 950 (2d Cir. 1991)); see also Brathwaite, 432 U.S. at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").[7]

In determining the suggestiveness of a lineup identification, "the 'principal question' . . . is whether the appearance 'of the accused, matching descriptions given by the witness, so stood out from all the other[s] . . . as to suggest to an identifying witness that [that person] was more likely to be the culprit.'"  United States v. Wong, 40 F.3d 1347, 1359, 1360 (2d Cir. 1994) (quoting Jarrett v. Headly, 802 F.2d 34, 41 (2d Cir. 1986)).  Furthermore, if the procedure employed is not impermissibly suggestive, "independent reliability is not a constitutionally required condition of admissibility, and

---

[7]     When the police employ a suggestive identification procedure, the factors that should be considered to determine the likelihood of a misidentification include "[(a)] the opportunity of the witness to view the criminal at the time of the crime, [(b)] the witness' degree of attention, [(c)] the accuracy of the witness' prior description of the criminal, [(d)] the level of certainty demonstrated by the witness at the confrontation, and [(e)] the length of time between the crime and the confrontation."  Neil v. Biggers, 409 U.S. 188, 199-200 (1972).  "A good or poor rating with respect to any one of these factors will generally not be dispositive . . . .  In each case, the factors must be assessed in light of the totality of the circumstances."  United States v. Concepcion, 983 F.2d 369, 377-78 (2d Cir. 1992).

the reliability of the identification is simply a question for the jury." Id. at 1359 (quoting Jarrett, 802 F.3d at 42).

Here, the trial court found that Hinds and the fillers were sufficiently similar in appearance that the lineup was not unduly suggestive. (See Tr. 132-33, 137; Bernstein Decl. Ex. A). Moreover, the Appellate Division reviewed the lineup photographs and agreed with Justice Cropper that "the difference between [Hinds'] hairstyle and the hairstyles of the fillers was insignificant and did not call undue attention to [him]." Hinds, 730 N.Y.S.2d at 230. Hinds has neither presented any evidence nor pointed to anything in the record which would suggest that these determinations were incorrect.

Additionally, while the "wanted wall" photograph created a risk of taint with regard to Santana's identification of Hill, there is no basis on which this Court could conclude that the lineup identifications of Hinds resulted from improperly suggestive procedures. For that reason, the Appellate Division correctly concluded that there was no need for an independent source hearing.

3.     Ineffective Assistance of Trial Counsel

In order to prevail on an ineffective assistance of trial counsel claim, Hinds must demonstrate that (a) his counsel's performance "fell below an objective standard of reasonableness" and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland

v. Washington, 466 U.S. 668, 688, 694 (1984).  Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard."  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

None of Hinds' ineffectiveness arguments withstands scrutiny.  First, Hinds argues that Conway was ineffective at the Wade hearing because she focused on Santana's identification to the exclusion of Wareham's identification, and failed to seek an independent source hearing with respect to Wareham's identification.  (See Bernstein Decl. Ex. B at 43).  What he fails to acknowledge, however, is that a lineup either is or is not improperly suggestive.  Accordingly, if the composition of the lineup was fair when it was viewed by Santana, it also was fair when it was viewed by Wareham.  Moreover, there is nothing in the record indicating that Wareham ever saw Hinds or his photograph after the date of the robbery.  There consequently is no intervening event which could have tainted the lineup that Wareham viewed.  For these reasons, any further argument by counsel at the Wade hearing with respect to Wareham's lineup identification would clearly have been fruitless.  Accordingly, Hinds is not entitled to relief on the theory that Conway was ineffective at the Wade hearing.  See United States v. Kirsh, 54 F.3d 1062,

1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance.").

Hinds also claims that his counsel was ineffective during the trial. Each of the accusations he levels, however, is unsupported by the record. For example, Hinds criticizes Conway for making an oral motion for a severance that was untimely, not made on notice to the prosecution, and unlikely to succeed. (See Bernstein Decl. Ex. B at 44-46). As part of that fusillade, Hinds also contends that Conway was ineffective because she revealed to the court and to the prosecution, without his consent, statements that Hinds had made to her. (Id. at 46).

Under New York law, severances are disfavored when defendants are alleged to have acted in concert. See People v. Mahboubian, 74 N.Y.2d 174, 183 (1989). Accordingly, to secure a separate trial based on antagonistic defenses, a defendant must show that "the core of each defense is in irreconcilable conflict with the other and [that] there is a significant . . . danger that the conflict alone would lead the jury to infer defendant's guilt." Id. at 184. The federal case law is similarly stringent. See United States v. Swanson, 572 F.2d 523, 529 (5th Cir. 1978) (defendant claiming lack of intent not entitled to severance from co-defendant who took stand, claimed nonparticipation, and identified defendant as mastermind of extortion scheme); see also Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990) (habeas petitioner must show that "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve

the testimony offered on behalf of his co-defendant.") (internal quotation marks omitted; brackets in original).

On the facts of this case, it was not unreasonable for Conway to conclude that a pretrial severance motion would not have been successful since (a) Hinds could have testified that he did not know that the person he was with intended to commit a robbery, (b) Hill could have denied that he was present, and (c) the jury could have acquitted both defendants if it accepted their factual claims.

When Conway learned that Hill was threatening Hinds, the situation changed markedly. At that point, on the eve of trial, Conway did not have the luxury of making a written motion on notice to the prosecution. Given the very real risk that her client would refuse to testify at a joint trial, it would have been irresponsible for Conway not to bring the problem promptly to the court's attention. Moreover, even if it might have been better for her not to have disclosed Hinds' potential defense, there has been no showing that this led to any prejudice.

Hinds also criticizes Conway for failing to counsel him not to testify since he would be pitting his credibility against that of Wareham, who had no motive to lie. The simple answer to this assignment of error is that Conway ultimately urged Hinds not to testify after he changed the theme of his defense. (See Tr. 716; Bernstein Decl. Ex. B at 47). Since the story that Hinds ultimately told the jury differed markedly from the one that Conway originally thought he would present, her earlier advice suggesting that he testify is irrelevant.

In any event, even if Conway's representation were shown to be deficient, to prevail on his ineffective assistance claim, Hinds would have to establish that the outcome of the trial would have been different but for the error. <u>Strickland</u>, 466 U.S. at 684. In this case, even Hinds' appellate counsel was forced to concede that "[i]t seems unlikely that competent representation would have resulted in the acquittal of . . . Hinds." (Bernstein Decl. Ex. B at 50). Given the testimony of the victim and a disinterested bystander, both of whom identified Hinds as one of the robbers, and the outlandish tale that Hinds related when he testified, there is no basis upon which this Court could reasonably conclude that another attorney would have secured an acquittal for him.

In sum, there is no factual or legal basis for any of Hinds' ineffective assistance of trial counsel claims.

IV.    <u>Conclusion</u>

For the foregoing reasons, Hinds' petition should be denied. Additionally, because Hinds has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

V.    <u>Notice of Procedure for Filing of Objections to this Report and Recommendation</u>

The parties shall have ten days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a) and (e). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, United States District Judge, and to the

chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Rakoff. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:    New York, New York
            June 30, 2006

                                    FRANK MAAS
                          United States Magistrate Judge

Copies to:

Hon. Jed S. Rakoff
United States District Judge

Dennis Hinds [Pro Se]
#97-A-7725
Mohawk Correctional Facility
P.O. Box 8451
6100 School Road
Rome, New York 13440

Willa J. Bernstein, Esq.
Assistant Attorney General
Office of the New York State Attorney General
120 Broadway
New York, New York 10271

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/5/06